## [No. 3648.]

### George P. Burkhard v. The State.

1. Practice — Special Counsel.— The employment of special counsel by private prosecutors to assist the district or county attorney is not inhibited by the laws of this State. State's attorneys, however, should retain the direction of the cases, and not resign the same to assistant counsel.

2. Murder of the Second Degree.— Charge of the Court must be tested with reference to the evidence, and it is always sufficient when it correctly and distinctly sets forth the law applicable to the evidence. In felony cases the charge, to be sufficient, must contain the law and *all* of the law applicable to every issue legitimately raised by the evidence. Note the opinion and the statement of the case for evidence *held* sufficient, in a murder trial, to present the issue of murder in the second degree, and to demand, therefore, a charge upon that grade of offense.

3. Same.— If, in a criminal trial, there be evidence which presents an issue favorable to the defendant, the trial court should not disregard it, but should accord to the accused, fully and fairly, the submission of the issue to the jury.

4. Same — Malice.— Note the statement of the case for a state of proof in a murder trial which demanded of the court a clear and full definition of the terms malice aforethought and express malice.

5. Same.— Manslaughter is not a grade of offense which should be charged upon a murder trial in the absence of evidence tending to present such defense.

6. Same — Insanity.— See the statement of the case for a charge of the court upon the question of insanity, *held* correct.

7. Same.— Under the law of this State, temporary insanity, superinduced by the use of ardent spirits, may be proved for the purpose of determining the degree of murder of which the defendant may be found guilty. Such proof having been adduced upon the trial of this case, it was the duty of the court to give a proper charge presenting the question of the defendant's

temporary insanity caused by the use of ardent spirits, in connection with instructions upon murder in the second degree.

8. Murder — Evidence.— The trial court refused to permit a defendant on trial for the murder of his wife to introduce evidence to prove his wife's infidelity with another man, and that recently before the homicide he was informed of that fact. *Held* error. That and any other evidence which would tend to show that the defendant had reasonable cause to be excited, troubled of mind, or in any wise mentally distracted, and to render it improbable that, in perpetrating the homicide, he acted with a cool, sedate and deliberate mind, is admissible in a trial for murder.

Appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The indictment in this case, filed on the 2d day of April, 1885, charges the appellant with the murder of Dora Burkhard, in said county, on the 31st day of March, 1885, by shooting her with a pistol. The trial commenced on the 8th day of May, 1885, and was concluded on the 12th day of the same month by the jury returning a verdict of guilty against the appellant, of murder in the first degree, and assessing the penalty at imprisonment in the penitentiary for life; on which verdict judgment has been rendered.

James Hamilton was the first witness for the State. He testified that he had no acquaintance with the defendant prior to the day that he killed his wife. While the witness, on the day of the homicide, was standing some fifty or sixty steps from Dunbar's house, on the opposite side of a board fence, he heard a scream, and some one, Mrs. Dunbar the witness thought, called out that the defendant had shot his wife. Mrs. Dunbar after this ran out of her house to the sidewalk in front. The witness then saw Mrs. Burkhard, the defendant's wife, run across the yard in the rear of Dunbar's house, to the privy, thence behind it, and grasp the fence. A few minutes later the defendant walked across the yard towards his wife, with a pistol in his hand, talking to himself. When he got near the privy his wife fell down, and then the witness noticed blood running down her left side. Defendant asked her twice if she was dead. Receiving no reply the defendant remarked: "Then we will both go together." He then placed the pistol to his head, fired and shot himself through the head. He then laid the pistol down between himself and his wife, and leaned his head over her, when she grabbed the pistol and ran out of the yard to the front sidewalk. Witness went for a policeman, and when he got back Mrs. Burkhard was dead.

The defendant followed the deceased in a walk. Witness heard

but one shot, the one defendant fired at himself. The pistol used by the defendant was a small, plated weapon, and looked like a five-shooter. If Mrs. Burkhard spoke at all after she was shot, the witness did not hear her. Witness did not see the defendant leave the yard, and did not know where he went after the shooting. Witness, as he went back, saw the defendant in charge of the policeman. Witness could not recall the date on which the shooting occurred, but the hour was about sundown. Mrs. Wilburn was about the premises when the shooting took place. He saw Mrs. Dunbar outside of the fence before he went to summon the policeman. After the defendant shot himself, he laid the pistol down on the ground between himself and his wife, and she picked it up and left, the defendant following her. All of this occurred in San Antonio, Texas.

Mrs. Wilburn was the next witness for the State. She testified, in substance, that she lived on Austin street, in the city of San Antonio, Texas. She knew the defendant when she saw him, and had a slight acquaintance with Mrs. Dora Burkhard, deceased, the reputed wife of the defendant. The witness was at home when the shooting occurred, which was at about half-past 5 o'clock in the evening. Witness did not remember the date, but it occurred about four or five weeks prior to this trial, which was had on the 8th day of May, 1885. Mrs. Dunbar and the witness lived in houses in the same yard, separated by an open board fence, through which it was easy to see from one house to the other. On the evening in question witness heard crying and swearing, which proceeded from Mrs. Dunbar's house, and shortly afterwards she heard several reports of a pistol. Upon hearing the cries and screams the witness ran immediately from the interior of her house to the front gallery, from where she saw a small eleven-year-old girl on Mrs. Dunbar's gallery. Mrs. Dunbar soon came to her front gallery, and said that the defendant was killing his wife. Witness, about this time, saw Mrs. Burkhard, covered with blood, run across Mrs. Dunbar's back yard towards the fence. Witness called to her to jump the fence. The defendant was then following her with a pistol in his hand. Witness was at that time standing very near the deceased. When the deceased reached the fence and fell back, the defendant reached her, and witness called to him not to shoot his wife any more, as he had already killed her. He asked her twice if she was dead, to which inquiries she made no reply. The defendant then looked up at witness, put the pistol against his head — the side of his head, witness thinks — and fired, remarking: "Dora, we will end our troubles

here together." The defendant fell as he fired this shot at himself. The pistol he used was a small weapon.

After the defendant fired the pistol at himself, the witness ran out and stopped a street car that was passing, and told the driver of the car and the passengers aboard that the defendant had killed himself and his wife. Returning from the street, she saw Mrs. Burkhard, with the pistol in her hand, in front of Mrs. Dunbar's house. She ran up the sidewalk and fell immediately in front of the witness's gate. The defendant followed her, stopped at a point a short distance from the body, looked at her, said nothing, and presently turned and walked away. Mrs. Burkhard was shot in the right side, and the witness supposed that the wound was the cause of her death. Some one who had arrived on the ground picked up the pistol used by the defendant and gave it to an officer whom the witness did not know. Mr. James Hamilton was in the back part of the witness's yard when the shooting occurred. When witness first saw the defendant and the deceased at the time of the tragedy, he had a pistol in his hand and she did not. If the deceased made any reply to the defendant when he asked if she was dead, the witness did not hear it. The witness heard two or three shots and could readily tell that they were fired in Mrs. Dunbar's house. Witness saw Mrs. Burkhard debark from a street car about ten or fifteen minutes before the shooting. She was then in perfect health. Witness did not know the name of the driver of the car she stopped, when she gave information of the shooting. Mrs. Burkhard was about twenty-three or twenty-four years old. At the time that the witness was standing at her gate, and the deceased was lying on the sidewalk, the defendant spoke to witness and told her, either that he had no intention of shooting her, or that he was not going to shoot any more, the witness could not now remember which. Mrs. Burkhard was dead when Doctor Lowry arrived. Witness saw the defendant when he was brought back to the body from down the street. He asked, when he was confronted with the body, if she was dead, but no one replied. He then pointed to the pistol, and said that it was the weapon he killed her with.

Cross-examined, the witness stated that she heard the shots and the screams about the same time. She could easily see over and through the fence. When the witness first saw Mrs. Burkhard, she was coming around the corner of Mrs. Dunbar's house, and the defendant was walking along behind her. Witness did not hear Mrs. Burkhard speak at all. Witness testified before the coroner that the defendant made the statement that his wife asked him to forgive

her, but that she did not hear Mrs. Burkhard make such request of the defendant. Witness stood very close to Mrs. Burkhard, the fence only between them, but did not hear her speak at all. Witness, who was excited, ran towards Mrs. Burkhard as soon as she saw her running back. Defendant was standing up when he shot himself. He then stooped over his wife and said: "Dora, we will end our troubles here together." When Mrs. Burkhard fell at the witness's gate, the defendant walked to a point some little distance from the body, looked at it for a few seconds, retreated about twelve feet, where he stopped and gazed at the body for about ten minutes, and then turned and walked off towards town. Witness repeatedly called for people to come and interfere, but could get no one to come near. Presently a colored man came up and said that if some one would go with him he would arrest the defendant. Defendant was soon arrested and brought back to the body. Mrs. Dunbar was with Mrs. Burkhard when the latter, a few minutes before the shooting, got out of the street car. Witness saw the defendant when he went to Dunbar's house just before the shooting, but heard no quarreling at Dunbar's house before the shooting.

Mrs. Lora Dunbar was the next witness for the State. She testified that she was the wife of Joseph Dunbar, and on the 31st day of March, 1885, lived on Austin street, in the city of San Antonio, Texas, next door to Mrs. Wilburn, whose house, like that of the witness, was a frame structure. The two houses stood in the same yard, separated by an open board fence. Witness was acquainted with the defendant and knew his wife, now dead. She died about one month prior to this trial. The deceased, when killed, on Tuesday, March 31, 1885, was stopping at the house of the witness, and had then been there several days. Witness did not see the killing, but was in the kitchen, the deceased and the defendant being then in the witness's room. The witness and the deceased went down town together on that evening, and returned to the house together about half-past 5 o'clock. The defendant came to the house about ten minutes after the witness and the deceased got back, and asked the witness if he could see his wife. Witness replied that he could. Witness then told the deceased, who at that time was with her in the kitchen, that she ought to go out and see her husband. In the mean time the defendant had gone into the witness's room, where he was presently joined by his wife. The door at first was left partially open, and the witness heard the deceased say to defendant: "George, I am sick and tired of hearing you talk to me in that way." The door was then closed from the inside; the witness did

not know by whom. It was not closed by either the witness or her hired girl, the only persons in the house besides Mr. and Mrs. Burkhard.

After some little time the witness heard a shot, which was presently followed by three or four more in rapid succession, and Mrs. Burkhard ran out of the house into the yard covered with blood. She ran to and caught hold of the back fence of the yard. The defendant followed her with a small pistol in his hand. The witness presumed that the small pistol exhibited was the same, but she could not identify it. Witness went out in front of her house and heard no more shooting after the defendant and the deceased went from the house to the back yard. In a little while Mrs. Burkhard ran out of the back yard, down the sidewalk, and to Mrs. Wilburn's front gate, with a pistol in her hand. Witness did not know how or where she got the pistol. Running out of the yard, she had her arms spread out. She fell at Mrs. Wilburn's gate. The deceased was in good strong health prior to the shooting. Deceased and defendant remained in the witness's room about ten minutes before they ran out into the back yard. The exact words witness heard Mrs. Burkhard use just before the door closed were: "George, I am sick and tired of hearing you talk in that way to me." Witness could not say at what part of Mrs. Burkhard's body the ball entered. Burkhard had the small pistol in his hand as he passed out of the room. His wife, the witness knew, had nothing in her hands, because she saw her hands uplifted. As he passed out he remarked: "I have got one more shot in here, Dora." Blood was flowing freely from the neck of the deceased as she ran out of the house.

Cross-examined, the witness testified that she had known the defendant and his wife about six months. He and his wife lived together in the house occupied by witness about five months. The defendant and his wife moved from that house to a house on Avenue "D," and kept house there about three months before the killing. The deceased had been back at the witness's house about four days when the killing occurred. She came back alone, told the witness that she and her husband were not then living together, and asked of witness permission to stay there pending divorce proceedings which she had instituted, or was going to institute. The defendant came to the witness's house and talked to the deceased two or three times on each of the four days she was there preceding the killing. The shooting occurred on the first Tuesday after the Saturday of the deceased's return to witness's house. Defendant came there Saturday night looking for the deceased. Witness always knew

when the defendant was in the house, but was seldom present at the interviews between him and his wife. He was at the house and asked to see his wife in the morning of Tuesday, the day of the shooting. The kitchen in which the witness was at the time the shooting occurred was situated about three yards from her room, in which the defendant and the deceased were. The deceased, when the witness saw her in the room at the time of the shooting, was sitting about two yards from the door. Witness could not then see the defendant or the position in the room occupied by him. A short interval elapsed between the first and the subsequent shots, but the last ones were fired in rapid succession. The defendant was, the witness supposed, in the back yard when his wife fell. When the first shot was fired, and the defendant and the deceased ran out of the house, the witness fled, first to the gallery, then to the yard, and then to the house of a neighbor, and heard no more shots. At this point the defense asked the witness if she knew the cause of the separation of the defendant and his wife, and if it was not occasioned by an intimacy subsisting between Mrs. Burkhard and a man named Stephenson? The court sustained objections to this evidence, and the ruling is the subject-matter of the eighth head-note of this report.

George Cullman was the next witness for the State. He testified that between the hours of 3 and 5 o'clock P. M., on the evening before the shooting, he saw the defendant at the Turner Hall, in San Antonio. He then had a pistol, which, according to the witness's recollection, was a thirty-two calibre five-shooter. The pistol was loaded. He exhibited this pistol to witness, put it in his hip pocket, and said that he was going home to kill his dog first, and then his wife, and if his wife wanted to go home, he would send her home in her coffin. The pistol now exhibited resembles the pistol he saw in the hands of the defendant on the evening in question, and was, in the opinion of the witness, the same. The barrel is of the same color, and the calibre the same. Witness had known defendant since August, 1884. He was drinking on the evening before the homicide.

Cross-examined, the witness stated that when the defendant came to him and spoke to him about his family troubles, he came alone. He appeared to be in his right mind, but had evidently been drinking. Witness told him that he did not care to listen to family quarrels.

John H. Copeland was the next witness for the State. He testified that he was an attorney at law. He knew Mrs. Burkhard at the time of her death, and had known her about two months. He

saw her about 5 o'clock in the evening of the day on which she was killed, at which hour on that day witness filed for her a petition for divorce from the defendant. Witness had the deceased with him when he filed the suit for divorce, and had her to make a necessary affidavit to some paper. Previously, on the same day, between 9 and 10 o'clock A. M., witness saw the defendant in front of the court-house. He had no acquaintance with him at that time. Defendant stepped up to witness and said: "Good morning. My name is Burkhard. Has my wife brought suit against me for divorce?" Witness replied in the affirmative. Defendant asked the grounds upon which she asked for divorce, and witness replied to him: "You ought to know. Because of cruel treatment." Defendant seemed to be perfectly sane when he spoke to witness. He told his name, discussed the divorce suit, and said the case would take another turn than the witness expected. The conversation lasted but a few moments. Defendant appeared perfectly calm, cool and self-possessed. The State rested.

The defendant introduced Fred Mokart as his first witness. Mr. Mokart testified that he was a member of the police force of the city of San Antonio. He knew the defendant, and remembered the shooting of Mrs. Burkhard, which occurred about 6 o'clock on the evening of March 31, 1885. Witness arrested the defendant for that shooting shortly after it occurred, taking him from the charge of Mr. King. Witness took him to jail, and was present when, a short time afterwards, the defendant's wound was examined. The ball entered under the chin and lodged in the roof of the mouth. It was extracted by Doctors Graves and Brannagan, in the presence of the witness.

On cross-examination the witness identified a pistol shown him as the same which was picked up from the ground near the body of the deceased by a lady, and handed to him.

James H. King was the next witness for the defense. He testified that he was a painter by trade. He knew the defendant and had some knowledge of the shooting of Mrs. Burkhard. Witness reached the scene of the tragedy from four to six minutes after it occurred. He saw Mrs. Burkhard throw up her hands as she was falling on the sidewalk. Witness, who was in a street car, got off and walked to where the deceased had fallen. The defendant was then standing fifty-five yards from the prostrate body of his wife, in the street, with his hat in one hand, rubbing the place where he had shot himself or had been shot. Witness took some papers from his pocket and told the defendant that he was compelled to

arrest him.   Defendant replied: "King, I will go with you," and
soon afterwards witness turned him over to a policeman who came
up.   The officer took the defendant to the body of his wife.   Wit-
ness observed the defendant closely when he arrested him, and saw
that he looked very like a man out of his head.   Defendant re-
marked that he was sorry he did not die too.   He said: "Ask me
no questions, but give me something to drink."   He called witness
by name, and knew him.   Witness asked him why he killed his
wife, and he replied: " I am sorry I did it, and I am sorry I did not
die with her."

Joseph Morris was the next witness for the defense.   He testified
that he lived on Austin street in the city of San Antonio, Texas,
near the Sun Set Railroad depot.   He knew the defendant and
had known him some eight or nine months.   Witness remem-
bered the day on which the defendant's wife was killed, and saw the
defendant on that day after his arrest.   He also saw him on the
Sunday or Monday previous.   He came to witness's place on that
occasion and remained about two hours.   Witness took particular
notice of the defendant on that occasion.   Defendant had, until a
few days before, been a steady, industrious, hard-working man.   A
great change in him had taken place when the witness saw him.
He talked and acted like a different man altogether.   Witness did
not think that the defendant, on the Sunday or Monday referred to,
was in his right mind, but that he was deranged.   The defense,
upon objection by the State, was not permitted to prove the lan-
guage of the defendant as a basis for the opinion of the witness as
to the defendant's insanity, but was informed that his appearance
and deportment was competent to be proved, and that his language
was only available to the State on cross-examination.

Proceeding, the witness stated that, on the occasion mentioned,
the defendant talked wildly about his wife and a soldier, and wanted
the witness to go with him to see his wife and get her either to
conduct herself properly or go home to Chicago.   His eyes had a
very glassy appearance, and he persisted in his talk about his family
troubles.   He began to play a game of " foot " with the witness,
but quit before the game was out or half out.   He appeared very
restless and very uneasy.   He gave witness his overcoat to put
away and take care of, but called for it again when he quit playing.
The witness was strongly impressed by his conduct that he was then
insane.   The witness was here asked whether or not there was a
prevalent rumor throughout the defendant's neighborhood that
adulterous relations were then existing between the defendant's

wife and a soldier named Stephenson. Objection to such evidence was sustained.

Cross-examined, the witness testified that the defendant was sober on Sunday and Monday before the killing. He drank one or two glasses of beer with the witness. Witness had seen the glassy appearance in the eyes of men who were not too drunk. Defendant was apparently in great trouble. He did not have the "jim-jams" *(mania a potu)*. Witness was a saloon keeper, but the defendant was not a customer. Drinking produces glassiness of the eyes. Witness did not know how much the defendant had been drinking when he reached witness's saloon.

Frank Baker was the next witness for the defense. He testified that he was an engineer, in the employ of the brewery. He had known the defendant about two years. He remembered the death of Mrs. Burkhard. Witness was at the brewery at the time of Mrs. Burkhard's death. He did not see the defendant on that day, but did see him some two or three days before. When the witness last saw him before the homicide he appeared to have changed very much from his former self. He looked very much like he had been drinking very heavily, and appeared to be crazy. Witness asked him why he did not go to work, and he replied, exhibiting a roll of money, that he did not have to work. He had a very distressed appearance; his eyes were heavy, his cheeks sunken, and his appearance generally was that of a man in great trouble. Witness did not think that he was in his right mind, but that he was insane from trouble. Previous to this time the defendant, so long as the witness had known him, had been a quiet, industrious, hard-working man.

Cross-examined, the witness stated that the defendant was a carpenter by trade, and at first, after coming to San Antonio, worked at his trade, but latterly had been delivering beer for the brewery. He quit work at the brewery about a month before the killing of his wife. Witness spoke to him some three or four days before the killing, when he looked as though he was just getting over a spree.

Frank Belter testified, for the defense, that he lived on Austin street in San Antonio, Texas. He knew the defendant, and had known him about two years. He remembered the death of Mrs. Burkhard. He saw the defendant on that day, on the day before, and on several days previous to that. During the three days, including the day of the homicide, the defendant had the appearance of being wild, crazy and out of his mind. He complained about a soldier visiting his wife. He looked crazy and talked like a lunatic,

and witness was convinced from the defendant's actions and conversation that he was thoroughly crazy on the day of the killing, and for several days before. He was mentally a very different man on those days than he had been before. He had been, previously, a quiet, steady, industrious and hard-working man.

On cross-examination, the witness was asked what particular aptitude he had to judge of a man's insanity. In reply he stated that he did not suppose his ability equaled that of the prosecuting attorney. When the defendant reached witness's place of business (on the day of the shooting?), he drank two toddies with the witness and the witness's brother. He did not stagger. Witness could not remember how many drinks the defendant took on the day before, but knows that he took as many as three or four toddies. Too many people frequented the witness's saloon and drank there for the witness to charge his mind as to the number of drinks any one man would take during the day. Defendant paid for the drinks he took. Just before he did the killing the defendant stopped in witness's saloon and took two toddies. He stayed about thirty minutes at the saloon, during which time the witness was in the store which adjoined the saloon. Witness drank once with the defendant on that evening. Witness did not know how long the defendant was at the saloon on the day before the killing. On Sunday he was at the saloon and drank some. Witness had seen a great many crazy men in his life-time, and on the morning of this trial he saw a Mexican pronounced insane by the court charged with his examination. Witness could not say that the defendant was crazy on the day of the killing, but he supposed a man was at least three-fourths crazy when he did not know what he was talking about, and the defendant, tested by that rule, was three-fourths crazy on the day of the killing. Lunacy and insanity, the witness supposed, meant about the same thing, and he thought that defendant on the day of the killing was a lunatic. Witness, however, was not present to define technical terms, but to testify to facts. Witness had not discussed the case with any one, and was present on subpœna.

Ferdinand Binz testified that he was the the proprietor of a dairy east of the government grounds. He knew the defendant, and remembered the day of the death of his wife. Witness saw the defendant on that day, and on the day before, but not on Sunday. Witness was with the defendant about thirty minutes on Monday. He was then drinking heavily and talking about his wife. He asked, in that conversation, the advice of the witness as to what he should do.

Cross-examined, the witness stated that he was with the defendant, on Monday, at Belter's saloon, and thence rode with him on the street car to Muth's saloon, where he shortly left him. He saw the defendant again on the next day — the day of the killing. This was between 11 and 12 o'clock. He asked where witness was going, and witness told him that he was going to the plaza. Defendant proposed to and did go with the witness to the plaza. Witness advised him to telegraph his wife's friends in Chicago to come and get her, which he did, telegraphing on Main street.

Cross-examined, the witness stated that he did not advise the defendant to kill his wife. Defendant wrote the telegram himself, dating it properly, and addressing it to his brother-in-law. He signed it " G. B." The defendant did not go to the court-house on that day to see Copeland, as long as witness was with him. He did not get out of witness's buggy on the plaza. Witness did not know where the defendant had been before 11 o'clock. He drank sarsaparilla with the witness at Belter's saloon. He was not then drunk, but had been drinking. Witness saw him take several drinks, but he did not know how many. Defendant was at least half drunk on the day before the homicide. Witness was with the defendant until about 2 o'clock on Tuesday afternoon, the day of the killing.

John McCormick was the next witness for the defense. Witness was a railroad man and lived on Government Hill. He knew the defendant by sight only, and had so known him since about March 28, 1885. Defendant came into Belter's saloon on the Sunday before the homicide, with his hat off. Witness invited him to step to the bar and take a drink. Defendant said " No, you take something with me," and put a gold coin on the counter. The defendant took considerable gold money from his pocket, and said something about a soldier taking his wife from him. Witness was with the defendant about an hour on that occasion. He looked and acted like a man who did not know what he was doing. He seemed much worried about his wife, had a wild stare about his eyes, and did not, in the opinion of the witness, know what he was doing. Witness thought then and still thought that the defendant was insane. Witness left the saloon before the defendant did, and had no idea how much longer the defendant stayed there. Witness had never before seen him to know him. Witness did not know how many drinks the defendant took on that occasion, but he heard him frequently invite those in the saloon to drink with him. Witness could not tell how a man would look drunk, unless he knew the man. Witness on that occasion attributed the defendant's appearance and actions to family

troubles, and not to drink.   Defendant told Mr. Cavanaugh about his family troubles.

Cross-examined, the witness said that the defendant looked to him on that Sunday like a man who had been on a protracted spree.   Witness was not an expert on insanity, but thought that the defendant's actions on the Sunday before the killing were the result of excessive drink and great mental trouble.

John Wilson was the next witness for the defense.   He testified that he was a private in the United States army.   He knew the defendant and had known him about one year on the day that his wife was killed.   He did not see the defendant on the day of the homicide, nor on the day before, but saw him at Belter's saloon on the preceding Sunday.   He looked crazy or wild, or very much under the influence of whisky.   He pounded his hand as though he was crazed by something.   He did not appear to be in his right mind, and witness did not think that he was.   This was about 10 or 12 o'clock A. M.

Cross-examined, the witness testified that the defendant was at Belter's saloon about an hour, but witness could not say how many drinks he took.   Witness did not, in fact, see him take a single drink.   The eyes of a crazy man are white and wandering, and they water very easily.   Defendant's eyes were in just such a condition.   Witness did not assume to know much about crazy men. He was never in an insane asylum, but took General McKenzie and other men to Washington.   He did not know the definition of the word " crank."   Witness had never expressed his opinion to any one, and had not been to the defendant or his counsel, or volunteered to testify in this case, or to give his opinion as to defendant's mental condition at or about the time of the shooting. Witness entertained friendly feelings for the defendant.

Richard Burke was the next witness for the defense.   He testified that he was a carpenter by trade, and had known the defendant since October, 1883.   He saw the defendant on the Sunday afternoon before the killing.   Witness worked in the same shop with the defendant once for about six weeks, and thought that his opportunities of knowing him well were good.   He worked under witness's supervision for about three weeks before the shooting, and witness found him a quiet, hard-working, industrious man.   Defendant quit work on the Saturday evening before the shooting, and was to send his wife to Chicago on Monday — the day before the killing — with Mr. Lipsky.   It was the understanding of the witness that the Mr. Lipsky delayed his departure for Chicago, a few days,

at the request of the defendant and his wife, in order to escort Mrs. Burkhard to that city.

B. Buckley testified, for the defense, that he was a policeman on duty in the city of San Antonio. Witness had a slight acquaintance with the defendant. Witness saw him and spoke to him near the "Sun Set" depot on the day of the homicide. He appeared very much troubled and disturbed about the conduct of his wife. He talked to witness about nothing else. This was about 3 o'clock in the afternoon. He was very much excited and did not look like a sensible man.

Cross-examined, the witness testified that defendant had apparently been drinking some, but was not very drunk. Witness was a pretty good judge of whether or not a man is drunk. It was about 3 o'clock on the evening of the homicide that the witness saw the defendant at the depot. When he left witness he went towards town. Defendant was very much excited, but perhaps could have gone to the telegraph office, written and dispatched a telegram. Witness next saw the defendant about half-past 6 o'clock, in charge of an officer. This was after his wife's death. Witness did not then know of the killing. Witness was on his way to his beat when he last met the defendant.

John Cavanaugh was the next witness for the defendant. He testified that he was a sanitary officer of the city of San Antonio. He had known the defendant from nine to twelve months. Witness and the defendant lived in the same yard about five months. When defendant moved, he moved only across the street. Witness saw the defendant on the day of the killing, and on the Monday, Sunday and Saturday previous. He was drinking on Saturday afternoon. He was sober on Sunday morning, but drunk on Sunday evening. Witness saw him on Sunday evening at Belter's saloon, where the defendant told him that his wife had left him. He wanted to treat everybody at Belter's saloon. From what witness could judge, he was out of his mind on Sunday evening. He was out of his mind on Monday, and apparently worse on Tuesday, the day of the homicide. Witness saw him between 4 and 5 o'clock on the evening of that day. He looked wild and haggard; was muttering to himself as he walked uneasily up and down the sidewalk, throwing down and picking up his hat, and rubbing and clasping his hands. He had never, so far as the witness knew, acted in that manner before. He had always before been an industrious, hard-working man. He had worked at the brewery, and had to do his own cooking on going home. The change in the defendant took

place, the witness thought, about eight days before the killing, and was, he thought, the culmination of family troubles. On the Saturday before the killing, when the witness saw him, he said that his head pained him and he had to quit work. In the opinion of the witness, the defendant was insane on Monday and Tuesday.

Cross-examined, the witness said that, in his opinion, the defendant was not drunk on Monday when he saw him. On Tuesday witness saw him near the "Sun Set" depot, and did not then think that he was drunk. Defendant was then prancing about on the sidewalk. Witness stopped and looked at him, and was with him awhile. He drank nothing while with witness, but when he left the witness, he went towards Morris's saloon. On Monday the witness saw him at the corner of Avenue D and Sixth street. The last time witness saw the defendant at work was about a week previous to the killing. Defendant was not drunk on Sunday, Monday or Tuesday when the witness saw him. Witness saw him at Belter's saloon on Sunday, and talked with him for about an hour.

The material part of the testimony of Andrew Carey, introduced for the defense, in addition to his statement that, basing his opinion upon personal observation, he believed that defendant was of unsound mind on Saturday and Sunday, was that he went with defendant to Dunbar's house on Sunday evening, and heard him request and urge his wife, in the presence of Dunbar and wife, to go with him home, and that the deceased replied she would not live with him another day.

Cross-examined, this witness stated that he had never met defendant prior to Saturday evening, and he met him then in Belter's saloon. Defendant took three or four drinks on Sunday evening, but witness did not think he was drunk. He was not right, but witness did not think he was drunk. He had no arms with him on that evening. Witness found and left him at a saloon.

The defense produced a witness to testify that, shortly before the homicide, he detected the deceased and one Stephenson together under circumstances clearly showing that they were then copulating, and that he informed the defendant of the fact a short time before the homicide. The court refused to admit the testimony.

The substance of Richard Coffee's testimony was that he saw the defendant on Saturday, Sunday, Monday and Tuesday, several times each day. Witness was satisfied that he was not in his right mind on either of those days. He was so well satisfied of it that he would not leave his house, where his own wife was, while defendant was there. Defendant was at witness's house at least seven times be-

tween Saturday night and Tuesday, asking for his wife. He was greatly excited on each occasion. He spoke of his family trouble, raved and raged about it in a perfect frenzy; spoke of nothing else, and inveighed against the ruin of his home and his wife. He complained that his wife did not go to Chicago as she agreed to do; that she had brought disgrace on herself and him by going to a house she ought not to visit. He said that she was criminally intimate with a man named Stephenson, who kept a house specially to meet her in. Witness met defendant at the Sun Set depot on Tuesday morning. He appeared quieter than for several days, but was excited. He told witness that he was going to town to collect some money and pay witness what he owed witness; that his wife had given him $20, but he had foolishly " blowed it in." Witness remarked that, as she was well supplied, she could well afford to give him $20. Defendant asked how witness knew his wife had money, and witness told him that he had seen the money. Defendant then asked where his wife got it. Witness replied: " I suppose you have seen what I have, and ought to know." Mrs. Burkhard had given witness an envelope containing $60 and two rings, to keep for her, and said that Stephenson gave them to her, to return from Chicago with, and that she did not want her husband to know it. Deceased gave witness this money for safe-keeping on the Friday before the killing. Witness did not know, as a matter of fact, that defendant or deceased had sold furniture to get money to pay Mrs. Burkhard's expenses to Chicago, but heard so. Witness thought defendant insane from Saturday until the killing.

At this point the court announced that, the witness having been permitted (no objection being interposed) to state the declarations of the defendant upon which he based his opinion of the defendant's insanity, the witnesses who had not been permitted to make such statements could be recalled by the defendant, and examined upon the subject. Several were recalled, and testified in effect that defendant, during the two or three days preceding the homicide, complained of his wife's infidelity to him, and her intimacy with the man Stephenson, and of her having quit him to live with Stephenson. To one or two he told that Stephenson had provided her with money to return from Chicago. To another he declared that on Thurday he surprised his wife and Stephenson under suspicious circumstances.

The State, in rebuttal, introduced John Copeland, who saw the defendant on the day of the tragedy, and Mr. Ransom, who saw him on the same day, but after the killing. Each of these gentle-

men testified that the defendant appeared to them to be perfectly sane. Another witness testified that he saw the defendant on Monday, and that he then appeared distressed but sane.

The charge of the court upon the question of insanity, which is the subject-matter of the sixth head-note of this report, reads as follows:

"The defendant, in addition to the plea of 'not guilty,' pleads non-accountability by reason of insanity. An issue is thus raised as to the mental capacity of the defendant at the time it is alleged the homicide was committed, and to pass properly upon this question you are to consider all the facts which you find by the evidence to be established, which relate to the conduct of the defendant prior to the alleged killing, and subsequent thereto, as well as at the time of the alleged homicide.

"Where a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime, and the mental capacity to know whether they are right or wrong, he is responsible for his conduct. But if he does not possess this degree of capacity, he is not responsible. The true test is whether the defendant is able to have and did have a criminal intent, and the ability to judge of the right and wrong of the act charged.

"If you believe from all of the facts and circumstances in evidence in this case that the defendant, at the time of the alleged killing of Dora Burkhard, was mentally unable to have a criminal intent, and that he did not have the ability to judge of the right or wrong of the act charged, and that he was deprived of his reasoning faculties to such an extent as to indicate a diseased mind, you will acquit him.

"If, however, you find from all of the facts and circumstances in evidence in this case, that defendant at the time of the alleged homicide was of sound mind, you will then proceed to inquire into the charge against the defendant as set forth in the indictment, under the instructions hereinafter given you."

The motion for new trial raised the questions discussed in the opinion.

*Shields & Shields*, for the appellant. The chief point in the fourth assignment of error was the offer of the defendant to prove recent acts of adultery between the deceased, who was his wife, and a soldier named Stephenson, and that defendant had knowledge of this fact at the time of the homicide, and appeared to be greatly

distressed and excited thereby, and, in the opinion of the witnesses, insane, and that he remained in this condition of mind from the time of learning this fact up to the time of the homicide.

We submit that this testimony was clearly competent, and material, as showing a motive for the act, and also showing that at the time of the homicide the defendant did not possess that cool and sedate mind necessary to make the offense murder in the first degree; hence tending to reduce the grade of the offense, and in mitigation. Such testimony has uniformly been admitted in murder trials. (*Clark* v. *The State*, 8 Texas Ct. App., 350; *Maher* v. *The People*, 10 Mich., 212; *State* v. *Jones* (N. H.), 11 Am. L. Reg., 661; *State* v. *Jones* (Iowa), 23 Am. L. Reg., 771.)

The defendant's third special requested charge, and also all of the others up to and including the sixteenth, bear upon the insanity of the defendant and contain the law, as we understand it, applicable to this phase of the case. (Tay. Med. Jur., 729, 782–3, 792–4; Ray's Med. Jur. of Insanity, par. 141–2, 151–3; Bouv. Law Dic., title "Insanity" and "Mania;" *Stevens* v. *The State*, 9 Am. L. Reg., 530; *State* v. *Crawford*, 14 Am. L. Reg., 21; *Smith* v. *Com.*, 1 Duvall (Ky.), 224; *State* v. *Jones*, 11 Am. L. Reg., 661; *People* v. *McCann*, 16 N. Y., 58; *Com.* v. *Rogers*, 7 Met. (Mass.), 500; *State* v. *Jones*, 23 Am. L. Reg., 771; 1 Whart. Cr. L. (8th ed.), par. 43 and 44; *Webb* v. *State*, 5 Texas Ct. App., 609.)

The defendant's eighteenth special requested charge refers to the intoxication of the defendant, and fairly presents the question of how far such intoxication may have rendered defendant incapable of cool and deliberate reflection, and hence would aid the jury in determining the grade of offense charged. We think the facts in this case make it the imperative duty of the court to charge the jury on this point. (Laws of Texas, 1881, p. 9.)

In the eighth assignment of error we allege that the court erred in not charging the law applicable to the case, and in failing and refusing to charge the law of murder in the second degree and manslaughter.

Our first proposition under this assignment is that, under the testimony in the case, the offense, if any was committed, would not be murder in the first degree, by reason of the great mental distress and excitement of the defendant. This point can only be settled by reference to the testimony. On this point nearly all of the testimony on the part of the defendant is material, and we refer to it, but will call the particular attention of the court to the testimony of the witnesses who saw the defendant on the day of and near

the time of the homicide. Several witnesses who were well ac-
quainted with defendant swear that they saw him on the morning
of that day, and he appeared greatly distressed, and in the opinion
of the witnesses was insane.

Of the witnesses for the State who saw the defendant on the day
of the homicide but two have testified at all in relation to his men-
tal condition on that day, and neither of these witnesses had any
previous acquaintance with him. One saw him on the morning of
that day, but only for a few minutes, and the other saw him some
hours after the shooting, in the jail. The latter swears that the
defendant appeared to be distressed, and that it might be from
trouble,— he could not say. And the relations of the first of these
witnesses to the case were such as naturally to prejudice his mind
against the accused.

In *Farrer* v. *The State*, 42 Texas, 265, the court say: "Before
the accused can be convicted of murder in the first degree the State
must prove that the killing was done with express malice; this may
be done by proof of the cool, calm and circumspect deportment and
bearing of the party when the act is done, and immediately preced-
ing and subsequent thereto,— his apparent freedom from passion or
excitement; the absence of any known cause to disturb his mind or
arouse his passions." When the case at bar is measured by this
standard, how far short it falls of murder in the first degree! In
this case the testimony of the defense is virtually uncontradicted
that on the day of the homicide, and for several days prior thereto,
Burkhard was laboring under a very high degree of mental excite-
ment and distress.

Our second proposition under this assignment is that the court
ought to have charged the jury on the law applicable to murder in
the second degree and manslaughter. The charge must be appli-
cable to the case as shown by the pleadings and evidence. (*Lister* v.
*The State*, 3 Texas Ct. App., 17; *Hudson* v. *The State*, 40 Texas, 12;
*Sutton* v. *The State*, 41 Texas, 513; *Gatlin* v. *The State*, 5 Texas Ct.
App., 531; *O'Mealy* v. *The State*, 1 Texas Ct. App., 180; *Burnett*
v. *The State*, 12 Texas Ct. App., 15; *Holden* v. *The State*, 1 Texas
Ct. App., 237.)

In any case where the defendant is indicted for murder, and
the facts in evidence create a doubt, however slight, that the case
might be graded below murder in the first degree and yet be a
malicious killing, it would be the duty of the court to give the jury
an opportunity to pass upon that doubt. (*Halbert* v. *The State*, 3
Texas Ct. App., 656; *Hill* v. *The State*, 5 Texas Ct. App., 2; *Holden*

v. *The State*, 1 Texas Ct. App., 228; *Reed* v. *The State*, 9 Texas Ct. App., 317; *Farrer* v. *The State*, 42 Texas, 265; *Reynolds* v. *The State*, 8 Texas Ct. App., 412; *Marshall* v. *The State*, 40 Texas, 200.)

In *Templeton* v. *The State*, 5 Texas Ct. App., 398, the court held that a charge of murder in the second degree was properly given, and the testimony does not show a single word or act of provocation, or anything to mitigate or excuse the killing, but, as argued by the distinguished counsel for the defendant in the case, the testimony showed a deliberate murder by some one.

How much more was it demanded in this case under the testimony which shows that the defendant was laboring under the highest state of excitement, at the time of the homicide and for several days prior thereto, and for a cause well calculated to excite any honorable man. His family was broken up, and his wife, whom he loved, had committed adultery and deserted him. The appellant is not a professional criminal, but on the contrary had always been a quiet, sober, and industrious and peaceable man.

The ninth assignment of error is that the court erred in not defining or describing to the jury the legal meaning of the terms *malice* and *malice aforethought*. The charge does not attempt to define either. We submit that, under the numerous decisions of this court, this error alone would be sufficient to work a reversal of the judgment in this case. (*Jones* v. *The State*, 5 Texas Ct. App., 397; *Holmes* v. *The State*, 11 Texas Ct. App., 223; *Garza* v. *The State*, 11 Texas Ct. App., 345; *Hodges* v. *The State*, 3 Texas Ct. App., 470; *Ewing* v. *The State*, 4 Texas Ct. App., 417; *Daniels* v. *The State*, 4 Texas Ct. App., 429; *Smith* v. *The State*, 1 Texas Ct. App., 516; *Babb* v. *The State*, 12 Texas Ct. App., 491; *Tooney* v. *The State*, 5 Texas Ct. App., 163.)

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. I. There is no law of this State prohibiting counsel other than the district and county attorney from appearing and prosecuting a cause in behalf of the State. It has been the practice always in this State to permit attorneys employed by private prosecutors to assist the district or county attorney in the prosecution of a case. This practice has been known to all the Legislatures that have assembled in the State, and if it be an illegal or improper practice, as is contended by counsel for defendant, it is indeed strange that it has been so long and so universally tolerated by the law-making power and sanctioned by the courts. It seems

that, in some States, this practice is not allowed. But in most of the States it is sanctioned. It is, however, the duty of the district or county attorney to reserve to himself the direction of the case. This he should never surrender to assistant counsel. (Whart. Pl. & Pr., 3555, and cases there cited; 1 Bish. Cr. Pr., 3281.) The court did not err in overruling the defendant's objections to permitting the district attorney to avail himself of assisting counsel in the prosecution, both in the conduct and argument of the cause.

II. Grave objections are presented by counsel for defendant to the sufficiency and correctness of the charge of the court, and to the action of the court in refusing several special charges requested. These objections are all properly presented by bills of exception, showing that, at the time of the trial, the attention of the trial judge was called to the supposed defects in his charge which are now insisted upon for a reversal of the judgment.

The most serious objection urged to the charge is that it did not submit to the jury the issue and law of murder in the second degree. Under the charge as given, the jury had no discretion to find the defendant guilty of any grade of homicide lower than murder in the first degree. They were limited to a single alternative, that is, to find him guilty of murder in the first degree, or acquit him entirely. If the issue of murder in the second degree is not fairly raised by the *evidence*, the court did not err in declining to charge upon that grade of homicide. A charge must be tested with reference to the evidence, and it is always sufficient when it correctly and distinctly sets forth the law applicable to the evidence. (*Brown* v. *The State*, 6 Texas Ct. App., 286; *Smith* v. *The State*, 8 Texas Ct. App., 141; *Berry* v. *The State*, Id., 515; *Evans* v. *The State*, 13 Texas Ct. App., 225; *Neyland* v. *The State*, Id., 536; *Smith* v. *The State*, 15 Texas Ct. App., 139; *Rhodes* v. *The State*, 17 Texas Ct. App., 559.)

But in trials for felony the charge, to be sufficient, must contain the law and *all* the law applicable to every issue legitimately raised by the evidence. (*Reynolds* v. *The State*, 8 Texas Ct. App., 412; *Reed* v. *The State*, 9 Texas Ct. App., 317; *Neyland* v. *The State*, 13 Texas Ct. App., 536.) Does the evidence in this case fairly and legitimately raise the issue of murder in the second degree? If it does, the charge of the court is manifestly and materially insufficient. In stating our conclusion upon this question, we shall not recite the evidence bearing upon it, but merely express the impressions which it has made upon our minds after careful and repeated examinations of it.

Prior to the homicide, for several days, the defendant was observed by a number of his acquaintances who testified on the trial, to be in a strange and unusual state of mind. He acted and talked like either a crazy or a drunken man. A majority of the witnesses who testified about his condition were of the opinion that he was insane, while some attributed the change in his demeanor and appearance to intoxication. All of the witnesses who were acquainted with him, and who saw and observed him during the day of the homicide, and for two or three days prior thereto, agree that he seemed to be troubled and distressed in mind, and a number of them describe him as being greatly excited and distracted, restless, looking wild and haggard, and in fact presenting the appearances of insanity. Until within a few days before the homicide he had been a quiet, sober, industrious man. This marked change in his demeanor, conduct and appearance was sudden, and was at once observed by those who were acquainted with him and met him.

It manifested itself about a week before the tragedy, and continued up to that time, seeming to grow worse upon him. He was evidently impressed with the belief that his wife was unfaithful to him; that she had become criminally intimate with another man. She had separated from him. He had broken up housekeeping in consequence, and had sold his household goods to obtain money, as he said, to send his wife to her mother in Chicago, and had arranged for her to go in company with an old friend who was going to Chicago. She had agreed to go and was to start on the day before the homicide. She afterwards refused to go, and on the very day of the homicide instituted a suit against him for a divorce. From the time his wife separated from him up to the time of the homicide, he appeared excited and distracted. He ceased working, and to some extent indulged in the use of intoxicating liquors. All his thoughts seemed to be about his domestic troubles; all his talk was about them. His purpose seemed to be either to get his wife to live with him again, or to get her to go to her mother; to get her away from the man who had, as he said, seduced her. This man, it appears, had furnished her with money with which to obtain a divorce, or with which to return from Chicago in case she went there, but she concluded not to go. This fact was known to the defendant, and he talked about it. When he committed the homicide he was alone with his wife in a room at the house where she was staying. He had gone to the house and called for her, and they went into the room together and shut the door. When they had been in the room about ten minutes pistol shots were heard in the room and she came

rushing out, wounded and bleeding. He followed her in a walk, with a pistol in his hand. She reached the fence of the back yard and fell. He went to where she was and asked her if she was dead. Receiving no reply, he shot himself with the pistol. She then seized the pistol and got up and ran out on the street and fell dead. He got up and went to where she was and looked at her and then walked off a little distance and remained until he was arrested. He made no effort to escape. On the day before the killing he showed a witness a pistol and remarked that he was going home, and was going to kill his dog and then kill his wife, and if his wife wanted to go home he would send her home in her coffin. Another witness testified that on the day before the killing he saw the defendant; that he was then inquiring for a pistol, and wanted witness to go and see his wife and get her to go back to Chicago, and said if she would not go back alive he would send her back in her coffin.

We cannot help being impressed from the evidence with the conviction that for several days prior to the homicide, and at the very time of the homicide, the defendant was laboring under strong mental excitement, produced in part perhaps by indulging in strong drink, but mainly caused by his domestic troubles. Whether this mental condition was insanity, we are not now discussing or considering. What we desire to arrive at now is, whether or not, under this state of facts, his mind may not have been so excited and distracted, so disturbed and unbalanced, as to create a probability that the homicide was the result of a sudden, rash conception and impulse of the mind, and not the act of a cool, calm, deliberate, sedate mind, done in pursuance of a formed design to kill.

Concerning the condition of mind which is essential to constitute express malice and murder in the first degree, that profound jurist, Judge Moore, has furnished us with a clear and concise view of it which is, in our opinion, directly applicable to the facts of this case. We refer to his opinion in the case of *Farrer* v. *The State*, 42 Texas, 265. That case, together with the case of *McCoy* v. *The State*, 25 Texas, 33, are the leading cases in our State upon the distinction between murder in the first and second degree. They have been followed in repeated decisions by this court, and are recognized as the established law of this State.

Our conclusion is that the evidence in this case fairly raises the issue of murder in the second degree, and that the court should have submitted that issue, with proper instructions as to the law relating thereto, to the jury. "Where there is evidence (as we think there is in this case), which presents an issue favorable to the de-

fendant, the trial court should not disregard it, but should accord to the accused, fully and fairly, the submission of the issue to the jury." (*Moore* v. *The State*, 15 Texas Ct. App., 1.)

III. The charge of the court does not explain to the jury the legal meaning of malice aforethought, and malice express. It instructs them how malice may be evidenced. In view of the peculiar facts of this case, we think it was of the greatest importance to the defendant that the court in its charge should have clearly and fully defined the terms malice aforethought and express malice.

IV. We do not think the evidence raised the issue of manslaughter, and the court did not err in declining to charge upon that grade of homicide.

V. Upon the issue of insanity, we are of the opinion that the charge of the court is sufficient, and in accordance with the doctrine established by the decisions in this State. (*Thomas* v. *The State*, 40 Texas, 60; *Webb* v. *The State*, 5 Texas Ct. App., 596; *Williams* v. *The State*, 7 Texas Ct. App., 163; *Clark* v. *The State*, 8 Texas Ct. App., 350; *King* v. *The State*, 9 Texas Ct. App., 515; *Webb* v. *The State*, 9 Texas Ct. App., 490.)

VI. There was evidence tending to prove that at the time the defendant committed the homicide he was temporarily insane from the use of ardent spirits. This evidence of itself demanded that the issue of murder in the second degree should be submitted to the jury, as it is provided by statute that such temporary insanity may be proved for the purpose of determining the degree of murder of which the defendant may be found guilty. (Acts 17th Leg., p. 9; *Charles* v. *The State*, 13 Texas Ct. App., 658.) A proper charge presenting the question of defendant's temporary insanity, caused by the use of ardent spirits, should have been given in connection with instructions upon the law of murder in the second degree. (*Erwin* v. *The State*, 10 Texas Ct. App., 700.)

VII. We think the court erred in rejecting the evidence offered by defendant to prove the adulterous intercourse between his wife and the man Stephenson, and that recently before the homicide he had been informed of this fact. This and any other evidence which tended to show that he had reasonable cause to be excited, troubled, distracted and frenzied, that he had knowledge of facts well calculated to destroy his mental equilibrium, to dethrone his reason, to render it improbable that he could and did act with a cool, sedate and deliberate mind in committing the homicide, was in our opinion admissible.

Other errors have been assigned and presented by counsel for de-

fendant in an able brief, but we consider it unnecessary to pass upon them, as they are eliminated from the case by the reversal of the judgment.

Because of the errors in the charge of the court, and the error in rejecting evidence offered by the defendant, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered June 24, 1885.]